We'll now turn to 23-4148, U.S. v. Redfoot. May it please the Court again, I'm John Grebelius on behalf of Brandon Redfoot. This case turns on two errors that undermine Mr. Redfoot's claim of self-defense. First, the District Court excluded testimony that would have corroborated why he went to Tesha Gardner's house that day, which was not out of murderous intent, but out of concern for his son. The second error is that the District Court permitted highly inflammatory testimony that my client pointed a gun at Tesha Gardner's head a couple weeks before the shooting in this case. And under the facts here, that evidence served no permissible purpose other than to suggest propensity. These two errors tip the scales on the crucial question of whether the prosecution disproved my client's claim of self-defense beyond a reasonable doubt. Was it the same firearm or unknown? I don't know for certain. I think it might have been, but I don't know. I'll start with the first issue, unless the Court wants to hear on others beforehand. So under Federal Rule 8033, we know that hearsay statements of the then-declarant state of mind are admissible, and that shows emotional condition or motive or things of that sort. And this Court has made clear that this rule permits the then-declarant to express concern about well-being of another. That's under the Joe case. And the statements that we have here, that Mr. Redfoot was concerned about his son, fall squarely under the rule. They express a mental state or a mental condition of being concerned, and they do not include the reason for that concern. That was not part of it. And so under this Court's case law, that error was obvious. So you're right in that it should have fallen under the 8033 hearsay exception. Why was that relevant? Well, it was relevant because the government's whole narrative in this case was that my client formed the intent to commit murder in the truck. But what was he charged with? He was charged with second-degree murder. So did that require him to form an intent in the truck on his way to the murder scene? It did not require it, certainly, but that was the government's whole narrative. And certainly if my client, for instance, is going to this house because he's concerned for his son, that supports his position or his narrative that he went there for an innocuous intent, which was not to shoot anyone but in order to see his son. Again, relevance problems, which is his son didn't live there. His son lived with Grandma. Grandma had a gray sedan. The gray sedan wasn't there. There's no reason to think that the son would have been there, in other words. Well, I disagree with that. First of all, we have testimony from my client that his son had been there. I understand that Tesha Gardner has testified that there was a protective order, that the son had only been there once, and it was just, I think it was briefly. But I'll point out something about Tesha Gardner's own testimony. And there's a couple things, actually. One is that she's talking about violating a protective order. And according to my client's testimony, if it's true, then they would have been violating protective orders. So she at least has a motive, and certainly a good one, not to be open about how many times she's violating this protective order not to have contact with their son. And another point about that is she was convicted prior of lying to police or at least a crime related to lying to police. So there's good reason to doubt her testimony. And again, my client did offer evidence that this had happened before. Well, what's our standard of review on this evidence issue? Well, we're under plain error, Your Honor. You agree that it's plain error? Yes. Yes. Yeah, we're under plain error on this. And as I've said, we have error, and it's obvious. I was going to actually move to the second issue and then circle back to harm, unless the court would rather me proceed to harm. On the second issue, admission of testimony, my client pointed a gun at Tasha Gardner's head. This was unfairly prejudicial. The only disputed issue in this case was whether my client acted in self-defense. And under Comanche, we know that when self-defense is at issue, this type of evidence is highly prejudicial and inadmissible to prove anything related to self-defense. Now, I acknowledge, as I did in my opening brief, that this evidence did tend to show possession within the charged time frame of count three. Certainly, I acknowledge that. However, to the extent that it shows possession under count three, it was cumulative at best and had no probative value. Because by the time the court and the jury had heard this testimony, they had also heard from defense counsel that my client was admitting to the shooting using that gun within the charged time frame, implying that he had possession. We had unrebutted testimony from Rosa Garcia, both in direct and in cross-examination, that my client was the shooter that day. We have unrebutted testimony from Rachel Cornpeach on direct and cross-examination, that my client was the shooter that day and that my client had possessed that gun in the weeks before the shooting. And then certainly last, Tasha Gardner, before she testified to this incident, had testified, albeit it's a little unclear, but that my client was there and the shooter that day. Are you saying for all those reasons, the probative value was diminished or that it was zero? It was zero. At that point, the point had been conceded and certainly proven time and time and time again. What about animosity for people in the house at that address? I guess... Well, he says he's going back to protect his son who's not there, but he's also got a bad relationship with Ms. Gardner, who was at the store and left because he came and he ends up back at her place. If he pointed a gun at her head recently, that might undercut the idea that he was just back there on a goodwill mission. Well, the testimony at trial doesn't show that he was aware that Tasha Gardner was at the Merck at the time and had left the Merck at that time. So the testimony was that Tasha Gardner went there with her then roommate, Lily Garcia, and they went in a separate truck. It was a blue truck. And the testimony was, I believe, from Tasha Gardner that she saw the white truck pull up and then they decided to leave. There's no indication that my client actually saw them leaving at that time. So I don't think that that sort of evidentiary connection can even be drawn from the evidence in the record. I wasn't really talking about that so much. Whether he saw her at the store or not, it's not that important. He knew where she lived. And he shows up and there's an almost immediate gunfire. And if he has a bad relationship with her, it seems like that might be relevant under the very loose relevant Rule 401 as far as what his intentions were when he got there. Well, I don't think it would really rise to that level because she, by anybody's narrative, was not an intended target of any way, shape, or form in this case. She happened to live there. So, no, I don't believe that that theory of relevance applies. You seem to be saying, and I thought the law was to the contrary, that if the defendant concedes an element or anything, that then there's no relevance to any evidence supporting that fact. But I thought the Supreme Court has said that the defendant can concede a point, but the government can put on its case and try to prove it. The one exception being possession of a firearm. You know the context for that. So, am I misunderstanding the law in that area? Your Honor is not misunderstanding the law. I believe you're referring to Old Chief and sort of the proverb or the maxim that the prosecution gets to prove its case the way it wants to. But I have two responses to that. First of all, 403 applies to every piece of evidence, intrinsic evidence or otherwise. The second response is I'm not saying that because we conceded it, that therefore they couldn't present evidence. We're not talking about evidentiary alternatives. I'm not standing before the court telling this court how the prosecution could have proven its case or should have. I'm telling the court that it was conceded and the prosecution had proven that element. And time and time again, by the time, this evidence already came out. So, the prosecution had already done its job is what I'm saying, unlike the situations that we see in Herrera and Old Chief and the like. Do you have any cases where this court has found plain error on a 403 analysis? I don't know whether it's theoretically possible, I mean, that this court has found plain error on a 403 analysis. I do not, Your Honor, but this is a good first case for that. But no, I am not aware of one in this circuit. Did you know of any elsewhere? Not off the top of my head. I'm going to talk about cumulative harm now from the errors. So, starting with the first issue, the exclusion of the testimony, as I've talked about, that would have helped him corroborate why he went to the Tesha Gardner's house, excuse me, and it would have corroborated or at least helped support his self-defense theory in that he didn't intend to shoot anyone until he exited the truck. Secondly, having heard that he pointed a gun at the mother of his child would make jurors much more likely to uncritically accept the prosecution's case. As we know from Comanche, this type of evidence is, quote, strong medicine for jurors. And this is true even if the government, as in this case, didn't argue it in closing. And that was also true even if jurors, unlike this case, receive an instruction telling them not to use it for propensity. And so balance that against the evidence supporting self-defense. Certainly we have Mr. Redfoot testify that he acted in self-defense. Rosa Garcia, for her part, did admit to law enforcement that she thought she might have heard two gunshots at the time. The back window of the red truck, the red truck was backed into the driveway, the back window had been shot out, suggesting there could have been a shooter from that side of the house. We have a neighbor testifying to a bald left-handed shooter. Everyone at the house, for their part, was high on meth, possibly drunk, and the two admitted to also being high on cocaine. Also, there was no search for weapons for anyone at that house. Everyone at that house left the scene immediately. So we know Rosa Garcia took Mr. Rodriguez to the hospital. But Tesha Gardner, Lily Garcia, and Hokie, for their part, left. Hokie was dropped off at the Merck. There may not have been a search for weapons, but there was a search for shell casings is my understanding. And they had 29 attributable to your client that were discharged and then one that was determined to have been old or could not have been discharged at that scene. Was that contested at the trial at all? It was in the sense, well, to the point of the, I think it was a .40 caliber shell casing that the government witness testified he believed was old. But he did admit that he couldn't date it and determined definitively that it hadn't been shot. But more importantly than that, as the government expert on firearms, I think his name is Gleim. I don't want to mess up his name, but it's in the record. He testified, as anybody who knows a little bit about guns knows, is that not all guns eject casings when they're fired. He talked about revolvers, for instance. Revolvers don't automatically eject shell casings. And so we don't have any sort of testimony that what was being used against my client was a semi-automatic handgun. We just don't have that. Do we have any testimony from anyone other than your client that there was oncoming gunfire? Your Honor, he was the only one who testified definitively to oncoming gunfire. But again, I'll remind the Court that Rosa Garcia did tell the police she thought she heard two different gunshots. And was there evidence that your client walked directly to the person that he shot without flinching or showing any hesitation, which would seem to be inconsistent with oncoming gunfire? Well, I think there was testimony that he wasn't ducking or dodging. But the one thing that I would point out about being consistent with being shot at is, yes, my client used 29 rounds, but he did not shoot Mr. Rodriguez 29 times. As we know, Mr. Rodriguez was killed by a ricochet bullet, and bullets were kind of hitting the house and the truck. And this type of errant shooting is consistent with being shot at. I mean, it's either poor marksmanship or shooting under stress. Was there any signs of gunshots into the home? Because the person who got shot had been sitting on a truck outside the home. That's correct. I believe I'd expect the front of the house to be sprayed with gunfire if there was someone shooting at him. I think there is testimony that it might have been Tesha Gardner or Lily Garcia. Those two were actually inside the home. One of them testified that bullets were hitting the house. So is there evidence?  You know, Your Honor, truthfully, I don't know. Let me ask you, what should we assume for purposes of assessing error that Ms. Cornspeak, was that her name? Cornpeach. Cornpeach. Would have testified that the defendant said he was going to check on his son. Why do we assume that without an offer of testimony? Well, Your Honor, I'm not asking this court to simply assume this. We look at the context of what was happening here, and there was a lengthy back and forth at this time. So counsel asks a question, objection, hearsay. Then counsel makes a record about why it's admissible under the rule of completeness. And the prosecution, for its part, is responding that you don't get to bring in defendant's statements as a hearsay objection, meaning that we're eliciting out-of-court statements. If he had said nothing, it wouldn't be a hearsay problem. But it doesn't end there because, again, defense counsel's explaining to the court why it comes in under the rule of completeness, and it only comes in under that rule if, in fact, he said that. I don't think you're addressing why we think she would have, why we assume she would have said this without any offer when her testimony that she did make was contrary to that. She said he hadn't said anything else. So don't you need, if your offer is rejected on hearsay or whatever grounds, don't you have to make a proffer of that witness's testimony? Well, the first step is I disagree that she ever said that he never said anything. She was never specifically asked what he said at this point in time. She did testify about being threatened, and she did testify what he did say about when he wanted to be let out of the car. But in general, don't you need to make that sort of proffer? Well, under 103, that's generally the rule. But as I cite the beach aircraft case, you don't have to do that if it's clear from the context what that proffer is. And here it was through the leading question and the party's dispute about why it was admissible. The proffer can just be the statement of the attorney about what the witness will say even if it contradicts. Well, that's enough of a proffer for the attorney to say, this is what we think this adverse witness will say? Yes, under the circumstances here, and I'll cite the court back to beach aircraft, because it's not only the leading question, it's the court's understanding and basis for not allowing the witness to answer the question, which is that it's eliciting hearsay, an out-of-court statement. I'm out of time, Your Honor, so thank you. Thank you. May it please the Court, Sam Peet for the United States. I want to begin by answering your question, Judge Phillips, and this is the record, page 349, when Ms. Tisha Gardner is questioned about the firearm. The prosecutor asks, will you tell the jury about when you had seen Brandon with the gun in the weeks prior? Ms. Gardner's answer was, when he had pointed the gun at me. Next question, can you describe the gun to the jury from that incident? Answer, it unfolded like a handgun to like a rifle. So Ms. Gardner did, in fact, describe the same gun that was the murder weapon. What in the world was the relevance of that? Well, there's a lot of relevance to it because it goes directly to an element of the crime of felon in possession here. The discharge of possessing that very firearm.  But there was, and that's the firearm that was, I'm trying to think how they connected that firearm to him at the scene. Was there a ballistics test? Yes, so not only did many of the witnesses describe like a small rifle, like a carbine, but additionally, Earl Gleam, who was the forensic technician who handled the two marks analysis, said that all 29 of those casings that were found along the road had been fired from that gun. And that gun had been buried for five years and later dug up with the cooperation of one of the witnesses, William Carter. So given that pretty strong testimony that he possessed the gun at the time of the killing, it would seem like it wouldn't take a lot of prejudicial effect for the prejudice to substantially outweigh the relevance. It really doesn't, you really didn't need that to prove that he, to prove your possession of a firearm. Well, except that the government had been alerted to the fact that the defendant wanted to argue self-defense here. And we did have witnesses who had impeachable qualities. The date range for the felon in possession was- Okay, so it's not just to show that he had that gun. It had to do with his state of mind at the time of the shooting. That was the additional relevance. Well, this was one of the contested issues at trial was, was this his gun or was this Ms. Cornpeach's gun? And each of these incidents during the two-week date range prior to the shooting were used to demonstrate that he was a felon in possession and that he was going around carrying this gun as his own, and that that gun ultimately was what he used when he murdered Julio Rodriguez. The incident where he stuck the gun to her head was two weeks before the shooting? It was within two weeks. We don't have a firm date as to when. And so we had three witnesses who could testify about his possession of the firearm prior to June 7, 2018, namely Kitty Standing Rock, who was Tisha Gardner's mom, and nosily went into his backpack and saw the firearm, which he described as a folding gun. Tisha Gardner, who said that he pointed the gun at her and described it as a gun that folds like that. And then also William Carter, who he said he took it again out of his backpack, which is where he'd been storing it, and showed him the gun and talked about it as if it was his. Was the theory that there was evidence supporting the felon in possession charge for dates that were prior to June 7, was that presented to the jury at all? Was it argued to the jury? Yes. So they argued you have sufficient evidence on this date and within the state range? Yes. And one other thing I wanted to highlight from the court's questions was that when Mr. Redfoot was cross-examined, this is the question, I'm taking this from the record at 9-28. So after you put on, or after we put on our evidence and Tisha tells the jury that she had given up physical custody of your son, you take the stand and say, oh, I know my son wasn't there despite what was said in the opening statement. Is that correct? Yes, that is correct. And so to your prior question to counsel, he knew that his son wouldn't be there. And we had that evidence over and over. Tisha had relinquished parental rights in 2017. She had testified that he had never seen their child at her house, that it had only taken place once at her mother's house, that her child hadn't been there in months. And so there was this competing issue of what was the reason for the initial turnaround when he leaves the mercantile and he goes to the west towards Roosevelt, Utah, and Julio Rodriguez and Rosa Garcia go east toward the Gardner residence. What was the reason for the turnaround there? Was it, as Ms. Cornpeach described, that he said, turn around, and he'd been embarrassed and he was mad, and she said no, and he fires around into the floorboard and says it's either you or him? Or was it this convenient explanation of I'm concerned about my son? And that provides the context for counsel's question of, so at the time, let me just do it verbatim, when you had said that he had told you to turn around and go in that direction following the red truck, he told you he was concerned about his son Freddie, didn't he? That question wasn't going to state of mind. That question was, I want to be able to assert the matter of that question, namely, that he turned around because he wanted to go and check on his son rather than he wanted to go back and get at Julio. And so the objection to hearsay was proper. And the court sustaining that objection was proper because this wasn't about state of mind. If he said he had mentioned he was concerned about his son, that would be one thing. But he said in the context of when he told you to turn around, he said he was concerned about his son. Now, to the court's other questions about no proffer to this point about what the answer to the question would have been, I can say with some confidence that the answer to the question would have been no, based on what Ms. Cornpeach had already testified to and that there's this, well, you know, it prevented the defendant from being able to corroborate his claim about his son. What's interesting is when we go in the record, when the defendant describes his version of the initial turnaround, when they go west from the mercantile, he says he was concerned about his son. And then his attorney asks him, did you say anything? I didn't say anything. Nobody was saying anything. And so he can't even meet his own burden of saying that he had told Ms. Cornpeach that he turned around initially. And then this argument evolves a little bit, and it goes back to, well, no, he must have said it to the second turnaround because what happened is they turn around and start going eastbound toward where the red truck had gone that had Julio Rodriguez, and they drive past the Gardner residence. They don't stop at the Gardner residence. They don't say, hey, let's slow down here because I want to go and check on my son. They, in fact, go past her residence and have to flip around again to go toward it, okay? So the idea that he would have said after, and if Ms. Cornpeach has believed on both counts as to, you know, them expecting her to answer yes on this question, the idea that he would say it's you or him and shoot a shot into the floorboard, by the way, which completely corroborates her because a bullet was found in that floorboard, and the forensics show that it came from that same gun, the murder weapon, and in a letter he writes to her, I should have respected you when you told me no, but I didn't want to at the time. So she's corroborated on that point, and he turns around again. I'm sorry, is that letter in evidence in the record? It is, yes. Do you know the site? I don't have it on me, but it is in the record, and I believe we addressed it in our briefing as well. But he turns around, and how would this make sense of, okay, I've already said it's you or him, but now I'm going to say I'm concerned about my son, but instead of driving into this kind of open dirt driveway area, gets out of the car, either has the gun with him or gets it immediately after getting out of the white Ram truck and starts raining bullets, 29 shots, toward the house that he's concerned that his son might be at, it doesn't make sense. And so not only is the suggestion that the answer to the question would have been yes unfounded, it just doesn't make any sense. And even if it was yes, it has no prejudice here, because once he gets out of that vehicle and starts shooting shots in a way that is unprovoked, no other witness saw any other firearm, no other witness saw any other shooter. Were they perfectly meshed in everything they said? No, but that's no trial. No trial is like that because people see things differently. What about this bullet hitting the rear of the car that was parked in the driveway? So the red Ram was riddled with bullets. Bullets were found in having gone through the windshield, having gone through the front of it. Some of them had gone through the windshield and probably through that back windshield as well. Some were found just below the back windshield, stuck in the metal of the back of the truck. So where did those come from? From Mr. Redfoot firing at the truck. The truck was facing Mr. Redfoot. No, it was facing the defendant. Yes. But I thought there were bullets in the back of that truck that he was aiming at. No, no, there are no bullets in the back of the truck. I misunderstood. I thought one of the indications that maybe he was being shot at was that there was a bullet that seemed to come from the opposite direction that hit the back of the car. I think counsel's argument was that the rear window had been broken out of the red truck, and that could indicate shooting from behind it. But all of the shots that we are aware of came from Mr. Redfoot. And then, you know, Julio Rodriguez is, for all intents and purposes, deceased, and they have to pick him up and put him in the red truck. And Rosa Garcia describes driving as quickly as she can because they don't have cell phone coverage there to try and get him to the ambulance garage. And so if she's driving quickly and there's a bullet hole and you've got tempered glass, that window is going to bust out anyway. So that being an explanation for shots coming towards him, it's not a great one, not to mention he's not corroborated by any witnessing another gun, any witnessing another shooter. And he wasn't, to Judge Phillips' point, he wasn't ducking. He wasn't dodging. He was brazenly walking for a space of 30 yards, firing without any fear. He was not hit with a bullet. The white truck that he was in was not hit. None of the people that were in the truck was hit. There was no forensic evidence or testimonial evidence that corroborates his claim that he had been fired at. Where were Rodriguez and Garcia as Redfoot got out of the car and approached? So they had just gotten out of the red truck, and they were kind of in the back area of the truck. And when the shots first started to fire, Rosa went down and she had better coverage. Julio Rodriguez had kind of been, and the truck wasn't perfectly in line with where the defendant was. It was kind of more like, I don't know, 30 degrees off of a photograph. Yeah. And so he was kind of at the back of it, and there was still that kind of open window. And one of the 29 shots from this extended magazine that he had bought with Miss Cornpeach when they got the gun, ricocheted off of, it appears to have ricocheted off of the back end of that truck, hit him in the head. He made some requests for help and then never regained consciousness. In the end, Your Honors, this evidence was overwhelming. Every witness other than the defendant was universal on a single shooter, a single gun. And the defendant himself was in that consensus initially. He stated to Special Agent David Ryan over six times on the night or the early morning hours after this, it's all on me, it's all on me. No one else should be charged with this. In light of that testimonial evidence, in light of the forensic evidence, and in light of his own statements prior to trial, not only do we not have air here, because first off, the hearsay objection was appropriate, and secondly, the evidence of the pointing of the gun was relevant and important to proving the felon in possession case, and paled in comparison to his later violence. Those are not airs. And even if they were airs, the evidence is so overwhelming that we would ask the court to also find that there was no prejudice here and affirm the convictions. Thank you, Your Honor.